The KEGEL COMPANY, INC., and DBA Products Company Inc., Plaintiffs–Appellees,

v.

AMF BOWLING, INC., Defendant–Appellant.

No. 96–1178.

United States Court of Appeals, Federal Circuit.

Sept. 17, 1997

---

Stephen D. Timmons, Hovey, Williams, Timmons & Collins, Kansas City, MO, ar-

gued for plaintiffs-appellees. With him on the brief was Jill D. Singer. Of counsel was William A. Rudy and Warren N. Williams.

Donald R. Dunner, Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P., Washington, DC, argued for defendant-appellant. With him on the brief were Robert D. Bajefsky and John R. Alison.

Before ARCHER, Chief Judge, SCHALL, and BRYSON, Circuit Judges.

SCHALL, Circuit Judge.

The Kegel Company, Inc. is the assignee of U.S. Patent No. 5,191,290, entitled "Bowling Lane Maintenance Machine" (the '290 patent). DBA Products Company, Inc. is the exclusive licensee under the '290 patent. (We refer to the Kegel Company and DBA Products Company collectively as "Kegel"). Kegel sued AMF Bowling, Inc. ("AMF") in the United States District Court for the Western District of Missouri for infringement of the '290 patent. AMF denied infringement and counterclaimed that the patent was invalid. In response to cross-motions for summary judgment, the district court held the '290 patent not invalid, held that it was infringed by AMF, and entered judgment of liability accordingly. *Kegel Co. v. AMF Bowling, Inc.*, No. 93–0095–CV–W–9 (W.D.Mo.1995). AMF now appeals. We have jurisdiction pursuant to 28 U.S.C. § 1292(c)(2) (1994). We affirm.

## BACKGROUND

### I.

The '290 patent is directed to various improvements in a bowling lane maintenance machine. Such machines are used to maintain the condition of bowling lanes by applying thin layers of conditioning oil onto the surfaces of the lanes. The conditioning oil, or "lane dressing fluid," protects the wooden surface of the bowling lane from wear caused by friction; the conditioning oil also influences how a bowling ball travels down the lane.

The American Bowling Congress enacts rules which specify how to apply conditioning oil to achieve a favored "lane profile." Since 1991, bowling lane operators have followed the "top hat rule," which specifies a lane profile characterized by light volumes of oil deposited along the outside edges of the lane and heavier volumes of oil in the center of the lane. Heavier application of conditioning oil in the center of the lane can result in higher bowling scores.

A bowling lane maintenance machine can automatically travel the length of a bowling lane. As it moves down the lane, it transfers conditioning oil from a storage tank to a buffer, which then applies the oil to the lane surface. The transfer of oil from the storage tank to the buffer typically is accomplished by means of a transfer roller.

The '290 patent discloses a bowling lane maintenance machine which enables a bowling lane operator to vary the application of conditioning oil as the maintenance machine travels down the lane. In this way, the operator is able to achieve a variety of lane profiles to suit different bowling events. The claimed machine essentially consists of three parts: a maintenance assembly, by means of which conditioning oil is applied to the surface of the bowling lane; a propulsion mechanism, which moves the machine down the lane; and a controller, which controls the maintenance assembly and the propulsion mechanism. '290 patent, col. 1, lines 43–50. It is the maintenance assembly that is at issue in this case. Figure 9 of the '290 patent illustrates in sectional view the structure of that assembly:

**FIGURE 9**

The storage tank, or lane dressing reservoir 40, contains conditioning oil. Six shiftable wick assemblies 46a–46f extend along the length of the tank. '290 patent, col. 2, line 62—col. 3, line 3. (Only wick assembly 46b is shown in Figure 9). One end of each wick sits within the storage tank. The other end is above the tank, in close proximity to the transfer roller 50. '290 patent, col. 3, lines 9–19. Attached to each wick, through a cable, is a solenoid.[1] (Figure 9 shows solenoid S2). When activated by the controller, which is not shown in Figure 9, a solenoid shifts its corresponding wick through a cable so that the wick is engaged or disengaged from the transfer roller. The transfer roller is positioned against the buffer 48. '290 patent, col. 2, line 62—col. 3, line 3. Thus, when a solenoid is activated and shifts its wick to engage the transfer roller, conditioning oil moves from the storage tank through the wick onto the roller. From the transfer roller, the oil moves to the buffer, which applies the oil to the surface of the bowling lane. The controller is programmed to activate individual solenoids separately to achieve any desired bowling lane profile. '290 patent, col. 5, lines 32–38; col. 6, lines 28–38.

The '290 patent issued on January 26, 1993. It has 18 claims, three of which (nos. 1, 7, and 14) are in independent form. Claim 7 is representative; it reads as follows:

7. In a bowling lane maintenance machine for applying a lane dressing to the surface of a bowling lane, the improvement comprising:

a maintenance assembly comprising means for storing lane dressing, a rotatable buffer means for applying the lane dressing to the bowling lane, and transfer means for transferring lane dressing from said storage means to said buffer means,

said transfer means including a transfer roller and a plurality of transversely arrayed wicks, each wick having one end positioned in fluidic engagement with said storage means and an opposed end selectively shiftable between a first position in engagement with said transfer roller for transferring lane dressing to said buffer means and a second position disengaged from said transfer roller for avoiding the transfer of lane dressing to said buffer means,

---

1. A solenoid is a coiled wire that produces an electromagnetic field when carrying a current. Placed within the range of the electromagnetic field, a conductive object will move in response

to the application of electric current to the coiled wire. A solenoid is typically used in this manner as a mechanical switch.

said transfer means further including means for selectively and independently shifting each of said wicks between said first position and said second position.

'290 patent, col. 9, lines 32–52.

## II.

AMF introduced its SILVER BULLET bowling lane maintenance machine in June of 1992. The SILVER BULLET machine has five flexible wicks, each controlled ·by an individual solenoid. The controller in the original SILVER BULLET machine was programmable to allow each wick to shift independently of the other wicks. Prior to the issue date of the '290 patent, however, AMF modified the SILVER BULLET machine by removing the controller's original memory chip and replacing it with a chip that permitted only a paired or tandem shifting of the two outer and two "track" wicks.[2] AMF later introduced its CENTURY PC bowling lane maintenance machine, which is substantially similar to the modified SILVER BULLET machine for purposes of this case.[3]

The Kegel Company filed suit against AMF on February 1, 1993. DBA Products Company joined the action as a plaintiff later that year. In its suit, Kegel alleged that AMF's SILVER BULLET machine infringed the '290 patent. The CENTURY PC machine subsequently was added as an accused device. Kegel sought both a preliminary and permanent injunction against AMF.[4] As noted, AMF denied infringement and counterclaimed that the '290 patent was invalid. AMF asserted that certain prior art anticipated, or rendered obvious, the invention claimed in the '290 patent. The asserted prior art consisted of a bowling lane maintenance machine used at Nottke's Bowling Center in Battle Creek, Michigan (the "Battle Creek machine") and a maintenance machine used at Don Carter Lanes and Mea-

dowbrook Lanes in Fort Worth, Texas (the "Fort Worth machine").

In due course, the parties cross-moved for summary judgment on the issues of infringement and validity. The focus of the motions was claim 7. AMF conceded that all the limitations of claim 7 were met in its accused products except one: the limitation that the claimed maintenance assembly's transfer means include "means for selectively and independently shifting each of said wicks between said first position and said second position." '290 patent, col. 9, lines 49–52.

The district court began its infringement analysis by construing the limitation at issue. The court observed that the specification for the '290 patent describes a machine which distinctly includes a maintenance assembly, a propulsion assembly and a control system. The court interpreted claim 7 to require that each wick have associated with it a separate solenoid. In so doing, the court rejected AMF's argument that claim 7 should be construed to include the controller which activates the solenoids. The court stated that since claim 7 is directed to the maintenance assembly, "[h]ow the controller is programmed is irrelevant to the ability to control each wick via its own solenoid." Based upon its claim construction, the court concluded that the SILVER BULLET and CENTURY PC machines literally infringed claim 7 of the '290 patent. The court stated that, because each accused machine's maintenance assembly had a one wick/one solenoid structure, "[e]ven though certain wicks on the SILVER BULLET and PC machines operate in tandem, each solenoid still selectively and independently shifts its own wick."

The district court denied AMF's cross-motion for summary judgment of invalidity. Addressing the anticipation issue, the court determined that "[n]either the Fort Worth nor Battle Creek machines contained all of

---

**2.** The "track" wicks in the modified AMF SILVER BULLET are the wicks immediately on either side of the center wick.

**3.** References in this opinion to the "SILVER BULLET machine" are to the modified machine.

**4.** Kegel subsequently withdrew its request for injunctive relief.

the elements of Claim 7 of plaintiffs' patent." In rejecting AMF's obviousness argument, the court stated that "[b]ecause the solenoids activate the wicks in the plaintiffs' patent, and in the [Battle Creek and Fort Worth] machines the solenoid only activated the tank, there are significant differences between the prior art and plaintiffs' patent."

## DISCUSSION

### I.

■ Summary judgment is appropriate when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We review the district court's grant of summary judgment *de novo* to determine whether the summary judgment standard was properly applied. *Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 545, 31 USPQ2d 1666, 1669 (Fed.Cir.1994). In this case, we agree with the parties that there is no genuine issue as to a material fact.

On appeal AMF argues that we should reverse the district court's judgment of infringement because the court erred in its claim construction. When properly construed, AMF asserts, the claims of the '290 patent do not read on its SILVER BULLET and CENTURY PC machines. Alternatively, AMF contends that if the district court's claim construction was correct, the court erred in not holding the claims of the '290 patent invalid as anticipated, under 35 U.S.C. § 102(b), or for obviousness, under 35 U.S.C. § 103. We address the infringement issue first.

### II.

■ Determining whether a patent is infringed entails a two-step analysis: "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro Mechanical*

*Sys.*, 15 F.3d 1573, 1576, 27 USPQ2d 1836, 1839 (Fed.Cir.1993). Claim construction is an issue of law, which we review *de novo*. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979, 34 USPQ2d 1321, 1329 (Fed. Cir.1995) (in banc), *aff'd*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Comparing the properly construed claims to the accused device or process presents a question of fact. *In re Hayes Microcomputer Prods., Inc.*, 982 F.2d 1527, 1541, 25 USPQ2d 1241, 1251 (Fed.Cir.1992). The plaintiff has the burden of proving infringement by a preponderance of the evidence. *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535, 19 USPQ2d 1367, 1369 (Fed.Cir.1991).

■ As noted, in the district court, the infringement issue turned on the limitation in claim 7 which states, "said transfer means further including means for selectively and independently shifting each of said wicks between said first position and said second position." AMF argues that the district court erred by not construing claim 7 in light of the function of the entire bowling lane maintenance machine. Specifically, according to AMF, the district court failed to take into account the teaching of the '290 patent that the patented invention provides flexibility by allowing each bowling facility "to be provided with its own distinctive lane dressing profile if desired." '290 patent, col. 6, lines 36–38. AMF asserts that the maintenance machine's control means is critical to achieving this flexibility because it activates the solenoids at programmed distances along the bowling lane so that "the amount of lane dressing applied to the lane is controlled in each area of a lane served by a corresponding wick to ... provide the exact, desired profile." '290 patent, col. 5, lines 32–38. Under these circumstances, AMF argues, as used in claim 7, "the functional word 'independently' ... must include the control functions performed by the programmable controller and its associated structure" that are part of the maintenance machine. Under this claim construction, AMF urges, the SILVER BULLET and CENTURY PC machines do not infringe the '290 patent be-

cause their controllers are only programmed to operate wicks in tandem.

For its part, Kegel argues that the district court did not err in its claim construction. It contends that the limitation at issue refers to "the function of the shifting means recited in the limitation (moving each wick by its own solenoid), not to the function of the unclaimed control means (choosing which solenoid to activate)." Kegel takes the position that the '290 patent's specification describes the claimed machine in terms of three discrete assemblies: the maintenance assembly, the propulsion system, and the control system. For this reason, Kegel argues, "the structure and function of the control means are not a part of the maintenance assembly, even though the control means is indeed part of the overall machine." For the reasons which follow, we conclude that the district court did not err in construing claim 7.

▆▆▆ In determining the proper construction of a claim, "the court should look first to the intrinsic evidence of record, *i.e.,* the patent itself, including the claims, the specification, and if in evidence, the prosecution history." *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582, 39 USPQ2d 1573, 1576 (Fed.Cir.1996). We have described such intrinsic evidence as "the most significant source of the legally operative meaning of claim language." *Id.* Extrinsic evidence (*e.g.,* expert testimony) also may be used in claim construction. *Id.* However, when "an analysis of the intrinsic evidence alone will resolve any ambiguity in a disputed claim term," it is improper to rely on extrinsic evidence. *Id.* 90 F.3d at 1583, 39 USPQ2d at 1577. In this case, the district court did not consider, and the parties have not directed us to, any extrinsic evidence.

The claim construction issue presented in this case is whether the limitation of claim 7 that the transfer means include "means for selectively and independently shifting each of said wicks" encompasses the function performed by the maintenance machine's programmable controller. We begin the claim construction process by considering the

words of the claim itself. *See Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 619–20, 34 USPQ2d 1816, 1819 (Fed.Cir.1995). Claim 7 is in both Jepson form and the means-plus-function format of 35 U.S.C. § 112 para. 6. Jepson form allows a patentee to use the preamble to recite "elements or steps of the claimed invention which are conventional or known." 37 C.F.R. § 1.75(e) (1996). Recently, in *Rowe v. Dror,* 112 F.3d 473, 42 USPQ2d 1550 (Fed.Cir.1997), we stated that "[w]hen this form is employed, the claim preamble defines not only the context of the claimed invention, but also its scope." *Id.* 112 F.3d at 479, 42 USPQ2d at 1553. As we recognized in *Rowe,* the fact that the patentee has chosen the Jepson form of the claim evidences the intention "to use the preamble to define, in part, the structural elements of his claimed invention." *Id.* Thus, we conclude that the invention of claim 7 consists of the maintenance machine in combination with the improvement to the maintenance assembly. *Cf. Pentec, Inc. v. Graphic Controls Corp.,* 776 F.2d 309, 315, 227 USPQ 766, 770 (Fed.Cir.1985) (stating that "the claimed invention consists of the preamble in combination with the improvement").

Turning to the language of claim 7, the preamble and the first paragraph of the claim provide as follows:

> 7. In a bowling lane maintenance machine for applying a lane dressing to the surface of a bowling lane, the improvement comprising:
>
> a maintenance assembly comprising means for storing lane dressing, a rotatable buffer means for applying the lane dressing to the bowling lane, and transfer means for transferring lane dressing from said storage means to said buffer means.

'290 patent, col. 9, lines 32–39.

▆▆▆ The subject of claim 7 is a specified improvement in a bowling lane maintenance machine. The specified improvement is "a maintenance assembly" having three parts: means for storing lane dressing; a rotatable

buffer means; and transfer means. The scope of the three-part improvement is defined by the word "assembly." Without an express intent to impart a novel meaning to a claim term, the term takes on its ordinary meaning. *York Prods., Inc. v. Central Tractor Farm and Family Center*, 99 F.3d 1568, 1572, 40 USPQ2d 1619, 1622 (Fed.Cir.1996); *Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 951, 28 USPQ2d 1936, 1938 (Fed.Cir. 1993); *SmithKline Diagnostics, Inc. v. Helena Lab. Corp.*, 859 F.2d 878, 882, 8 USPQ2d 1468, 1471 (Fed.Cir.1988). The '290 patent discloses no novel meaning for the term "assembly." When used in the context in which it appears in claim 7, "assembly" ordinarily means "a collection of parts so assembled as to form a complete machine, structure, or unit of a machine." *Webster's Third New International Dictionary* 131 (1986). Thus, the use of the word "assembly" indicates that, in claim 7, the inventors intended to claim a physical structure.

The remaining two paragraphs of the claim describe the transfer means of the maintenance assembly:

> said transfer means including a transfer roller and a plurality of transversely arrayed wicks, each wick having one end positioned in fluidic engagement with said storage means and an opposed end selectively shiftable between a first position in engagement with said transfer roller for transferring lane dressing to said buffer means and a second position disengaged from said transfer roller for avoiding the transfer of lane dressing to said buffer means,
>
> said transfer means further including means for selectively and independently shifting each of said wicks between said first position and said second position.

'290 patent, col. 9, lines 40–52.

■ The transfer part of the structure comprising the maintenance assembly of claim 7 is expressed in means-plus-function format under 35 U.S.C. § 112 para. 6. In construing means-plus-function language in a claim, a court "must look to the specification and interpret that language in light of the corresponding structure, material, or acts described therein, and equivalents thereof...." *In re Donaldson Co.*, 16 F.3d 1189, 1190, 29 USPQ2d 1845, 1849 (Fed.Cir.1994) (in banc).[5]

Turning to the specification, the SUMMARY OF THE INVENTION states that "[b]roadly speaking, the preferred machine includes a lane maintenance assembly, a propulsion mechanism ..., and a controller for controlling the maintenance assembly and propulsion mechanism." '290 patent, col. 1, lines 43–50. Thus, the invention is described as consisting of three separate and distinct elements: the lane maintenance assembly, the propulsion mechanism, and the controller. As seen above, the improvement of claim 7 of the patent is directed to the maintenance assembly.

In the first paragraph of the DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT, the specification defines the subcombinations in the machine: the housing, the maintenance assembly, the propulsion assembly, and the control system. '290 patent, col. 2, lines 35–38. Referring to Figure 9 of the patent, the specification states that the elements in the maintenance assembly include lane dressing reservoir 40, reservoir fill tube 42, reservoir overflow tube 44, shiftable wick assemblies 46a–46f, buffer 48, transfer roller 50, and solenoids S1–S6. '290 patent, col. 2, line 62—col. 3, line 3. The specification refers to the entire maintenance assembly as a single element for reference, labeled "14." '290 patent, col. 2, lines 35–38. The propulsion system

---

5. As noted, the claim construction issue presented in this case is whether the limitation of claim 7 that the transfer means include "means for selectively and independently shifting each of said wicks" encompasses the function performed by the maintenance machine's programmable controller. The pertinent inquiry in this case is whether, after looking to the specification, the claim language covers the control system in the machine. AMF does not contend that the court failed to consider any equivalents to the corresponding structure described in the specification. Thus, although claim 7 is in means-plus-function format, the case does not present an issue that is unique to such claims: "whether a determination of equivalents under § 112 para. 6 is a question of law or fact." *Markman*, 52 F.3d at 977 n. 8, 34 USPQ2d at 1327 n. 8.

and the control system are each described separately in the specification. '290 patent, col. 3, line 23—col. 5, line 38. The specification refers to the propulsion assembly as a single element for reference, labeled "16." '290 patent, col. 3, line 20, Figure 4. It also refers to the control system as a single element for reference, labeled "18." '290 patent, col. 4, line 37, Figure 14.

AMF argues that both Kegel and the district court ignore the broad disclosure of the '290 patent. Specifically, AMF asserts that *"how* each wick is shifted into and out of engagement with the transfer roller . . . must be considered when construing the claimed invention." In support of its argument, AMF points to two statements in the written specification. First, AMF notes the following statement:

> Controller 124 also activates solenoids S1–6 at programmed distances of travel along the bowling lane, these distances being indicated by the lane distance sensor 128. In this way, the amount of lane dressing applied to the lane is controlled in each area of a lane served by a corresponding wick 45a-f to provide the exact desired profile.

'290 patent, col. 5, lines 32–38. AMF also notes the statement in the specification that "[d]epending upon the desired profile of lane dressing application, data is entered into controller 124 to activate and deactivate solenoids S1–6 at selected distances of travel along the lane as indicated by sensor 128." '290 patent, col. 6, lines 28–31.

We are not persuaded by AMF's argument. We agree with AMF that, in the claimed invention, it is the controller that activates the solenoids to shift the wicks, so that conditioning oil is applied to the transfer roller. What stands squarely in the way of AMF's overall claim construction, however, is the language of claim 7 and the text of the relevant portions of the specification, discussed above. Based upon that language and text, we conclude, as did the district court, that the improvement claimed in claim

7 lies solely in the physical structure of the maintenance assembly. In other words, the controller, which is a separate and distinct subassembly or subcombination, is not part of the "means for selectively and independently shifting" each of the wicks in the maintenance assembly of claim 7. In the invention of claim 7, each wick is shifted "selectively and independently" by its own corresponding solenoid.

Finally, turning to the prosecution history of the '290 patent, AMF asserts that the inventors distinguished their invention over the prior art by pointing to functions that would employ the controller described in the specification. AMF refers specifically to Applicant's Preliminary Amendment, which states as follows: "The present invention allows a much wider degree of flexibility in that structure is provided for bringing each independent wick into and out of operative fluid transferring engagement. Thus, the lane profile may be adjusted not only transversely across the lane, but also longitudinally along the lane." We do not believe, however, that this statement is helpful to AMF. In our view, the statement only serves to further buttress what we have determined is the correct construction of claim 7. The fact that the inventors stated that the "structure" of their invention served to provide flexibility supports the conclusion that the language "means for selectively and independently shifting each of said wicks" refers to the solenoids, not the programmed controller. The claimed invention is able to alter the lane profile as the machine travels down the bowling lane because the one-wick/one-solenoid structure allows it to do so.

■ As noted, the district court found that AMF's SILVER BULLET and CENTURY PC machines literally infringed claim 7 of the '290 patent. Infringement of a claim with limitations in mean-plus-function form requires that the accused device perform the identical function at issue and incorporate the structure disclosed in the specification, or its structural equivalent, as the means for performing that function. *Intellicall, Inc. v.*

*Phonometrics, Inc.*, 952 F.2d 1384, 1388–89, 21 USPQ2d 1383, 1387 (Fed.Cir.1992).

AMF argues that its SILVER BULLET and CENTURY PC machines do not infringe. AMF contends that because it has programmed each machine's controller so that the solenoids at the ends of the machine always engage and disengage the two end wicks in tandem, the SILVER BULLET and CENTURY PC machines fail to meet the claim limitation that the maintenance assembly's transfer means include means for "selectively and independently" shifting each wick. According to AMF, the fact that the SILVER BULLET and CENTURY PC machines could be reengineered with new controllers so that their solenoids and wicks function in a way that would meet the limitations of claim 7 does not constitute infringement.

The problem with this argument is that it is premised on the construction of claim 7 urged by AMF, which we have rejected. It is true that "a device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim." *High Tech Med. Instrumentation, Inc. v. New Image Indus.*, 49 F.3d 1551, 1555, 33 USPQ2d 2005, 2008 (Fed.Cir.1995). The SILVER BULLET and CENTURY PC machines, however, do not require alteration in order to infringe claim 7, as properly construed. There is no factual dispute that the SILVER BULLET and CENTURY PC machines have a solenoid for each wick. None of the wicks are connected together in order to prevent each solenoid in the maintenance assembly from "selectively and independently" shifting its wick. Regardless of the way in which the SILVER BULLET and CENTURY PC controllers are programmed, the wicks in the machines are shifted by their individual solenoids.

### III.

Finally, AMF argues that the district court erred in granting summary judgment in favor of Kegel on the validity issue. AMF contends that, according to the district court's claim construction, which we have held is correct, the '290 patent is invalid by reason of anticipation under 35 U.S.C. § 102(b) or for obviousness under 35 U.S.C. § 103.

Invalidity must be established by facts supported by clear and convincing evidence. *National Presto Indus. v. The West Bend Co.*, 76 F.3d 1185, 1189, 37 USPQ2d 1685, 1687 (Fed.Cir.1996). "Anticipation under 35 U.S.C. § 102(b) requires the presence in a single prior art disclosure of each and every element of a claimed invention." *Electro Med. Sys. S.A. v. Cooper Life Sciences*, 34 F.3d 1048, 1052, 32 USPQ2d 1017, 1019 (Fed. Cir.1994). "[C]laims must be interpreted and given the same meaning for purposes of both validity and infringement analyses." *SmithKline Diagnostics v. Helena Laboratories Corp.*, 859 F.2d 878, 882, 8 USPQ2d 1468, 1471 (Fed.Cir.1988).

The Battle Creek machine, upon which AMF relies for anticipation, was the product of a modification of an earlier AMF machine. To construct the Battle Creek machine, a mechanic cut the single lane dressing storage tank of an AMF Century 100 machine into three separate sections, or tanks. There then was attached to each tank a wick. Each wick was attached so that one of its ends was submerged in conditioning oil in its tank, while the other end remained exposed outside the tank. At the same time, each of the three tanks had its own solenoid. When a tank's solenoid was activated, the solenoid caused the tank to move, or "rock," against the machine's transfer roller, thereby bringing the exposed end of the tank's wick into contact with the roller. This action caused conditioning oil from the tank to be applied to the transfer roller and then transferred from the roller to the machine's buffer for application to the lane.

The district court rejected AMF's anticipation argument. In so doing, it stated as follows:

> [T]he Battle Creek machine fails to include at least three significant limitations of

claim 7: 1) the "means for storing lane dressing" (i.e., a stationary tank for storing lane dressing or equivalent structure); 2) "each wick having one end positioned in fluidic engagement with said storage means and an opposed end selectively shiftable between a first position in engagement with said transfer roller;" and 3) "means for selectively and independently shifting each of said wicks between said first position and said second position."

We conclude that the Battle Creek machine does not anticipate the invention claimed in the '290 patent for the third reason stated by the district court. As discussed above, in the maintenance assembly of claim 7, each solenoid activates its individual wick, so that the end of the wick that is outside the "storage means," or "lane dressing reservoir 40," is brought into contact with the transfer roller by being "bent into engagement with the . . . roller." '290 patent. col. 3, lines 16–17.

The specification states that in the maintenance assembly of claim 7, each solenoid, when activated, causes the wick to bend or flex in and out of contact with the transfer roller. This bending is achieved by the use of springs that "bias [the] wick assemblies." Thus, we interpret the "means for selectively and independently shifting each of said wicks" limitation as referring to "shiftable wick assemblies," which in turn refer to the combination of the solenoids, biasing springs, and the flexible wicks. *See* '290 patent, col. 2, line 66—col. 3, line 19 (describing the wicks as "flexible wicks" that are "bent into engagement with the transfer roller" and, when not in contact with the transfer roller are "in a more straightened position spaced from the transfer roller"). Without the combination of these elements, the hardware could not be controlled in order to "select" between the on and off positions of the wicks.

In contrast to the "flexible wicks" of the claimed invention, the Battle Creek machine wicks are rigid. They are not the equivalent of "flexible wicks" because they change positions not by flexing, but rather by being dragged by a movable tank from one position to the other. Because we conclude that "means for selectively and independently shifting each of said wicks . . ." limitation necessitates the use of a "flexible wick," and because we conclude that the stiff wick/moveable tank assembly of the prior art Battle Creek machine is not the equivalent of a "flexible wick," we hold that claim 7 is not anticipated by the Battle Creek machine.

 AMF's final argument on appeal is that the district court erred in not holding claim 7 obvious in view of the Battle Creek and Fort Worth machines. The district court's determination as to obviousness under section 103 is a question of law which we review *de novo*. *Roton Barrier, Inc. v. Stanley Works,* 79 F.3d 1112, 1127, 37 USPQ2d 1816, 1828 (Fed.Cir.1996). The ultimate determination as to obviousness is based on four underlying factual inquiries: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of nonobviousness. *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.,* 72 F.3d 1577, 1582, 37 USPQ2d 1314, 1318 (Fed. Cir.1996).

 We have already described the Battle Creek machine. Like the Battle Creek machine, the Fort Worth machine was the result of a modification of AMF's CENTURY 100 machine. The modification was different, however. The Fort Worth machine had a single tank to hold lane conditioning fluid, with a series of individual, transversely arrayed wicks affixed along the lip of the tank. Upon activation of a single solenoid, the tank was rocked to bring the wicks into contact with a transfer roller. The Fort Worth machine also had an additional feature. That feature consisted of a second solenoid and a bar that moved in response to activation of that solenoid. When the Fort Worth machine was in operation, the bar could be moved against the center wick of the series of wicks affixed to the lip of the tank. In this way, the center wick could be held

against the transfer roller when the tank was rocked back through activation of its solenoid, and the other wicks were thereby disengaged from the roller. Holding the center wick against the transfer roller in this way would, of course, result in more oil being applied to the center of the bowling lane than to its sides.

The district court determined that "[b]ecause the solenoids actuate the wicks in the plaintiffs' patent, and in the [Battle Creek and Fort Worth machines] the solenoid only actuated the tank, there are significant differences between the prior art and the plaintiffs' patent." The court further determined that even when AMF's evidence was viewed in a light most favorable to it, the evidence did not show that the level of skill in the art was such that "the claimed invention would have been obvious over the Battle Creek and Fort Worth machines." Accordingly, the district court concluded, AMF "cannot prove by clear and convincing evidence that the claimed invention would have been obvious to one ordinarily skilled in the art at the time the invention was made."

We agree with the district court that the differences between the maintenance assembly disclosed in claim 7 of the '290 patent and the maintenance assemblies of the Battle Creek and Fort Worth machines are "significant." The teaching of the Battle Creek machine is to use solenoids to rock three separate tanks in order to bring the wicks that are affixed to the tanks into contact with a transfer roller. The teaching of the Fort Worth machine is twofold: (1) to use a tank that is rocked by solenoid action to bring wicks that are affixed to the lip of the tank into contact with a transfer roller; and (2) in this arrangement, to use a bar to hold the center wick of the array of wicks in engagement with the transfer roller after the tank is rocked away from the transfer roller. We believe that Kegel is correct in arguing that "[t]he first suggestion of solving the top hat problem by doing away with a tank that rocks is the Kegel invention" and that "the first suggestion of using multiple wicks where only the tips are shifted off and on the

transfer roller by respective solenoids is the Kegel invention." We will not disturb the district court's holding of nonobviousness.

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment in favor of Kegel on both the issues of infringement and validity is affirmed.

## COSTS

Each party shall bear its own costs.

*AFFIRMED.*