Michael L. McGINLEY, Plaintiff,

v.

FRANKLIN SPORTS, INC., Defendant.

No. 98–2225–JWL.

United States District Court,
D. Kansas.

Oct. 28, 1999.

Karen D. Renwick, Thomas V. Bender, Kip D. Richards, Walters, Bender & Strohbehn, Kansas City, MO, for Plaintiff.

Joseph B. Bowman, Shana J. Long, Shook, Hardy & Bacon L.L.P., Kansas City, MO, for Defendant.

## MEMORANDUM AND ORDER

LUNGSTRUM, District Judge.

In this patent infringement case, plaintiff alleges that defendant's distribution and sale of baseballs infringe certain claims of United States Patent No. 5,407,-193. The court held a Markman hearing on the matter on January 21, 1999, and subsequently issued an order construing the disputed claims of the '193 patent. *See McGinley v. Franklin Sports, Inc.*, 45 F.Supp.2d 1141 (D.Kan.1999). The matter is presently before the court on the cross-motions for partial summary judgment on the issue of infringement by plaintiff (doc. 114) and defendant (doc. 61). Also before the court are defendant's motions for partial summary judgment on the issue of patent validity (doc. 117) and damages (doc. 115). For the reasons set forth below, the court grants plaintiff's motion for partial summary judgment on the issue of infringement, and denies defendant's motions for partial summary judgment on the issues of infringement, patent validity, and damages.

## I. Background

The following facts are undisputed. On April 18, 1995, United States Patent No. 5,407,193 (the "'193 patent") was issued by the United States Patent and Trademark Office ("PTO") in favor of plaintiff McGinley. The '193 patent claims an instruction-al pitching device in the form of a baseball with specific finger placement indicia used to teach students how to grasp a baseball in order to throw different types of pitches. Plaintiff's invention was marketed and distributed as the Roger Clemens Instructional Baseball ("RCIB"). Defendant Franklin Sports also manufactured and sold a baseball designed to teach students how to throw different types of pitches. Defendant sold the allegedly infringing device, the Franklin Pitch Ball Trainer 2705 (the "2705 ball"), from at least as early as April, 1995 to March, 1999.

Plaintiff alleges that the accused device infringes claims 1, 2, 6, and 7 of the '193 patent. Those claims read as follows:

Claim 1: A baseball pitching training device for duplicating finger placement on a baseball by a student comprising:

a baseball cover;

a plurality of sets of finger placement indicia on said cover, said sets of indicia comprising:

a first set of indicia demarcating the placement of finger [sic] for throwing a first pitch;

a second set of indicia demarcating the placement of fingers for throwing, [sic] a second pitch;

a third set of indicia demarcating the placement of fingers for throwing a third pitch;

means for indicating the orientation of the baseball relative to the palm of the hand; and

means for coding said finger placement indicia sets for identification of each of said indicia associated with any one of said sets.

Claim 2: The device as claimed in claim 1 wherein said means for coding comprises a color for association with each indicia of a particular set.

Claim 6: The device as claimed in claim 1, wherein said means for indicating orientation comprises shaping said indicia to distinguish that portion of the baseball to be located proximate to the palm of the hand.

Claim 7: The device as claimed in claim 1 wherein said indicia are shaped to indicate a correct orientation of the baseball with respect to the palm of the hand.

'193 patent.

In the prior *Markman* proceeding, the court construed the "finger placement indicia," "means for indicating the orientation of the baseball relative to the palm of the hand," and "means for coding said finger placement indicia sets" clauses of claim 1. At that time, the court construed the "finger placement indicia" clause of claim 1 to mean "a baseball that has markings for left handed students, right handed students, or both." *See McGinley v. Franklin Sports, Inc.*, 45 F.Supp.2d 1141, 1143 (D.Kan.1999). The court construed the "means for indicating the orientation of the baseball relative to the palm of the hand" element of claim 1 to mean "a slight taper at the portion of each indicia situated closest to the palm of the hand, and any equivalents of such structure." *Id.* at 1146. The court construed the "means for coding said finger placement indicia sets" language of claim 1 to mean "indicia coded by color, by size, and/or by both color and size, and any equivalents of such structure." *Id.* at 1146.

## II. Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505; *see Adler*, 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment). The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

**1222**

■ Both parties contend that they are entitled to summary judgment with respect to the issue of infringement. In an action for patent infringement, the plaintiff bears "the burden of proving infringement by a preponderance of the evidence." *Kegel Co., Inc. v. AMF Bowling, Inc.,* 127 F.3d 1420, 1425 (Fed.Cir.1997). Thus, to defeat Franklin's motion for summary judgment of non-infringement, McGinley must show that "the evidence is such that a reasonable jury could return a verdict for [McGinley]." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. By the same token, because McGinley bears the ultimate burden of proof on the issue of infringement at trial, to prevail on its motion for summary judgment of infringement, McGinley must establish that the evidence is such that no reasonable trier of fact could return a verdict of non-infringement in favor of defendant. *See id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## III. Analysis

### A. Cross Motions for Partial Summary Judgment of Infringement or Noninfringement of Claims 1, 2, 6, and 7[1]

Pursuant to 35 U.S.C. § 112, ¶ 6, "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function, without the recital of structure, material or acts in support thereof, and such claim shall be construed to cover the corresponding structure, materials, or acts described in the specification and equivalents thereof." 35 U.S.C. § 112, 6. Claim limitations drafted pursuant to § 112, ¶ 6 are referred to as "means-plus-function" or "step-plus-function" limitations. *Mas–Hamilton Group v. LaGard, Inc.,* 156 F.3d 1206, 1211 (Fed.Cir.1998). The parties agree that the disputed claim limitation is in the means-plus-function format.

■ The determination of whether an accused device literally infringes a means-plus-function limitation involves a two-part inquiry. First, "the fact-finder must determine whether the accused device performs an identical function to the one recited in the means-plus-function clause." *Mas–Hamilton,* 156 F.3d at 1211–12. If the accused device exhibits identity of function, "the fact-finder must then determine whether the accused device utilizes the same structure or materials as described in the specification, or their equivalents." *Id.* at 1212.

■ To determine whether structural equivalence exists under § 112, ¶ 6, the court must ascertain "whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial." *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus.,*

---

1. The court notes that, in its motion for summary judgment on the issue of infringement, defendant claims that both its 2705 and 2707 models do not infringe the claims of the '193 patent. In its response, plaintiff asserts that, "[a]ccording to Defendant, this product was not sold until December 1998, more than six months after this case was filed." Pl.Mem. in Opp. to Summ.Jud. on Infring. at 15. Plaintiff maintains that the 2707 ball is not at issue in this action and defendant's motion for summary judgment on the issue of infringement with respect to the 2707 ball is, therefore, improper. *Id.* To support that assertion, plaintiff refers the court to the complaint, answer, and counterclaim filed in this action, as well as to verbal statements made by George Small, the designee of Franklin Sports, Inc., during his deposition taken on May 7, 1999. There, Mr. Small makes no objection to opposing counsel's comment that the 2707 "product is not at issue in this lawsuit." Small Depo. at 13:2–12. Defendant has failed to address this issue in its reply brief, and does not mention anything further with respect to the 2707 ball in any of its other summary judgment papers. Accordingly, the court will not consider the infringement issue as it relates to the 2707 ball.

*Inc.*, 145 F.3d 1303, 1309 (Fed.Cir.1998) (citing *Valmont Indus., Inc. v. Reinke Mfg. Co.*, 983 F.2d 1039, 1043 (Fed.Cir. 1993)). A change is insubstantial if it "adds nothing of significance to the structure, material, or acts disclosed in the patent specification." *Valmont Indus., Inc.*, 983 F.2d at 1043.

The only evidence before the court are the patent specification and the claims set forth therein, the accused device, and declarations by the plaintiff and a pitching instructor. The defendant has not provided any evidence to suggest that there is a material question of fact with respect to the issue of structural equivalence.[2] Thus, because there has been no demonstration that a question of material fact exists, it remains for the court to determine the issue as a matter of law on those undisputed facts.[3]

Plaintiff's instructional pitching device purports to teach a student how to recognize where his or her fingers are to be placed on the ball in order to throw specific types of pitches by acting as a visual cue for finger placement. The patent claims a means for orienting the ball relative to the palm of the hand, which the court has, as set forth above, construed as meaning "a slight taper at the portion of each indicia situated closest to the palm of the hand, and any equivalents of such structure." The markings are elliptical, or "egg-shaped," and are similar to the shape of a typical fingerprint—i.e., from the tip of the index or middle finger to slightly above the first knuckle of the finger shown. The finger placement indicia marked on the cover of plaintiff's product are color-coded to correspond to the different gripping patterns required for each of the types of pitches taught by the ball.

The accused device also utilizes color-coded markings to indicate the placement of fingers necessary to accomplish certain

2. The only document submitted by defendant that could possibly be considered "evidence" with respect to this issue on file with the court is the expert witness report of Bernarr Roe Pravel. In that document, Mr. Pravel expresses his opinion that the markings on the 2075 ball are structurally distinct from those found on plaintiff's product. *See* Pravel Report at ¶ 11. The report, filed pursuant to Fed.R.Civ.P. 26(a)(2)(B), is not a sworn document. As such, it does not pass muster as evidentiary support under Fed.R.Civ.P. 56(e), and was not considered by the court in making its § 112, ¶ 6 determination. *See* Fed.R.Civ.P. 56(e); *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998) (in summary judgment context, facts "from which a rational trier of fact could find for the non-movant ... must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein").

3. The issue of whether a determination of equivalence under § 112, ¶ 6 is a question of law or of fact remains unresolved by the Federal Circuit. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977 n. 8 (Fed.Cir. 1995) ("As th[e] issue is not before us today, we express no opinion on the issue of whether a determination of equivalents under § 112, para. 6 is a question of law or fact"); *see also Chiuminatta*, 145 F.3d at 1309 ("Because ... no reasonable jury could have found that the accused device has an equivalent to the disclosed structure, we need not resolve the question expressly left open by our in banc court in *Markman* ").

In its papers, defendant states that the finger outline shapes on its device are not structurally equivalent to those found on plaintiff's product. As noted above, however, and unlike plaintiff who submitted declarations made by himself and a pitching instructor to support its argument with respect to this issue, defendant has failed to offer any factual evidence in the form of affidavits, deposition testimony, or specific exhibits to support its contention. Standing alone, conclusory statements in legal briefs are insufficient to demonstrate the existence of a material fact issue. *See Adler*, 144 F.3d at 671. Thus, the court is left only with the results of its comparison of the patented product to the accused device and the evidence offered by plaintiff to support its contention that the markings on the accused device and those found on plaintiff's ball are structurally equivalent. Consequently, because defendant has failed to establish the existence of a material fact issue with respect to the question of structural equivalence under § 112, ¶ 6, the court need not speculate as to the propriety of categorizing the inquiry as one of law or of fact.

types of pitches. The indicia found on the 2705 ball are comprised of finger-like outlines with blunted ends. Rather than merely depicting a fingerprint of the rounded, upper portion of the finger, each finger indicium on the 2705 ball represents an outline of a finger from the tip to the first knuckle, or, in some of the markings, just beyond the first knuckle.

■ Turning first to the issue of functional identity, the court concludes that the markings on defendant's device accomplish the same result as those found on plaintiff's product, and thus that the devices exhibit identity of function. Toward that end, the court notes that defendant's ball contains a plurality of sets of finger placement markings, color is utilized to indicate the different types of pitches taught, and it is clear from defendant's finger outlines how the ball is to be placed relative to the palm.

Having determined that the accused device performs the same function as plaintiff's product, the court next considers the issue of structural equivalence. Defendant contends that the finger markings on the 2705 ball are not structurally equivalent to the markings on plaintiff's product because the 2705 ball's finger placement indicia are not tapered at one end like the markings found on plaintiff's product. Consequently, defendant argues, the patent limitation does not read on defendant's 2705 product because the markings on the 2705 device are not exactly the same as those found on the RCIB..

The court disagrees. As set forth above, literal infringement under § 112,

¶ 6 occurs where the accused device exhibits identity of function and "utilizes the same structure or materials as described in the specification, *or their equivalents.*" *Mas–Hamilton,* 156 F.3d at 1212 (emphasis added). Thus, the accused device need not utilize a precisely identical structure to accomplish its function; instead, the court's inquiry under § 112, ¶ 6 focuses upon whether the accused device is structurally *equivalent* to the patented product.

Comparing plaintiff's and defendant's respective products, the court concludes that the markings found on the accused device constitute the structural equivalents of those found on the patented product. Indeed, the markings on both devices not only perform the same function, i.e., both teach how to place one's fingers on the ball so as to throw certain types of pitches, but also they perform that same function using equivalent structures, i.e., color-coded markings on a baseball which, when viewed by the student, allow the student to discern precisely how to orient the ball within his or her hand. Although the markings on defendant's ball are shaped somewhat differently than those found on plaintiff's product, the court concludes that the difference is insubstantial: an elongation of the finger indicia, coupled with "blunting" the ends of each mark, as opposed to tapering them, adds nothing of significance to the structure disclosed in plaintiff's patent specification. Both types of indicia show the student precisely how to grip the baseball, and the difference between the structure used to accomplish this function is, at best, an insignificant alteration.[4]

Thus, because the court concludes that the markings on the accused device are the

---

4. In its papers, defendant argues that a finding of structural equivalence between the finger placement indicia on its product and those found on plaintiff's device necessarily renders plaintiff's patent invalid in light of the prior art. Def.Repl.Summ.Judg. on Infring. at 3 ("In short, finger outline marks and egg shape marks cannot be structural equivalents, while still preserving validity of the patent in

suit.") The court disagrees. The infringement inquiry is separate and distinct from a patent validity analysis; a resolution of one issue does not dictate the outcome of the other. Indeed, a patent may be held to be infringed, but invalid as anticipatory or obvious over the prior art. If the court believed that no material fact issues remained as to whether the prior art references cited by de-

structural equivalents of those found on plaintiff's product, the court grants summary judgment in favor of plaintiff and denies summary judgment for defendant on the issue of infringement.[5]

## B. Anticipation[6]

 Pursuant to 35 U.S.C. § 102, a patent is invalid if it is anticipated by the prior art. 35 U.S.C. § 102. "A judgment of invalidity for anticipation requires that a single prior art reference disclose every limitation in a patent claim." *General Elec. Co. v. Nintendo Co., Ltd.*, 179 F.3d 1350, 1356 (Fed.Cir.1999). Whether a prior art reference anticipates a patent claim is a question of fact. *Hoover Group, Inc. v. Custom Metalcraft, Inc.*, 66 F.3d 299, 302 (Fed.Cir.1995). For purposes of the anticipation inquiry, the existence of identity between a prior art reference and the claimed invention is gauged not from a layperson's perspective, but is instead judged from the vantage of "a person of ordinary skill in the field of the invention." *Scripps Clinic & Research Foundation v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed. Cir.1991).

Defendant argues that the '193 patent is invalid as anticipatory in light of the Quimby ball under 35 U.S.C. § 102(b). Plaintiff disagrees, arguing that the Quimby ball does not contain every element of the '193 patent and that the Quimbys' use of the ball does not constitute "public use" under § 102(b). Pursuant to § 102(b), an inventor loses his or her right to obtain a patent if "the invention was ... in public use ... in this country, more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b). The term "public use" includes "any use of [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor." *Baxter Intern., Inc. v. COBE Laboratories, Inc.*, 88 F.3d 1054, 1058 (Fed.Cir.1996).

fendant as anticipatory and obvious invalidated the patent, defendant's contention would be correct. As detailed below, however, the court concludes that it cannot, as a matter of law, declare that the '193 patent was either anticipated or obvious over the prior art.

5. Both parties have addressed the issue of infringement under the doctrine of equivalents in their summary judgment papers. As a preliminary matter, the court notes that an infringement analysis under § 112, ¶ 6 is somewhat similar to an infringement determination under the doctrine of equivalents. *See Valmont Industries, Inc. v. Reinke Mfg. Co., Inc.*, 983 F.2d 1039, 1043–44 (Fed.Cir.1993). The analyses are not, however, identical. *Id.* Indeed, whereas "[s]ection 112, ¶ 6, limits the broad language of means-plus-function limitations in combination claims to equivalents of the structures, materials, or acts in the specification[,][t]he doctrine of equivalents equitably expands exclusive patent rights." *Id.*

The above-noted distinction between the doctrines notwithstanding, the line separating the two infringement inquiries has become somewhat blurred as a result of the *Chiuminatta* decision. There, the court held that, absent a technological advance leading to the difference between the patented product and the accused device, a failure to find literal infringement under § 112, ¶ 6 may preclude a finding of infringement under the doctrine of equivalents. *Chiuminatta*, 145 F.3d at 1311. This holding appears to, for all practical purposes, transform the two infringement analyses into a singular, collective inquiry. Because the court concludes that, as a matter of law, the 2705 ball literally infringes plaintiff's product under § 112, ¶ 6, the court declines to address the issue of whether the accused device infringes under the doctrine of equivalents.

6. Defendant originally moved for summary judgment of invalidity for anticipation over the Quimby, Fox, Lee, and Vigil references. In its reply to plaintiff's memorandum in opposition, however, defendant concedes that disputed issues of fact remain as to whether three of the allegedly anticipatory prior art references, namely, Fox, Lee, and Vigil, actually invalidate plaintiff's patent. In light of defendant's concession regarding the existence of factual issues with respect to the Fox, Lee, and Vigil references, defendant's motion for summary judgment of invalidity for anticipation with respect to the Fox, Lee, and Vigil references is denied.

To support its theory that the Quimby ball anticipates the '193 patent, defendant offers the deposition testimony of Vicki Quimby. Ms. Quimby states that her son, John Quimby, developed the idea of the "Q-ster ball" sometime in "the mid to late '80s." Quimby Depo. at 7. The idea was apparently conceived after John Quimby decided to sketch designs on his baseball to show "a neighborhood boy" where to place his fingers in order to throw certain pitches. *Id.* At some point in 1989, Ms. Quimby, along with her son and daughter and a couple of friends, sketched several drawings of baseball covers, each with markings indicating finger placement for several types of pitches. *Id.* at 13–15. The sketches were accomplished by removing the cover of a baseball and tracing it. *Id.* at 16.

The court first notes that a fact issue likely exists as to whether the Quimby ball was ever actually reduced to practice. Indeed, Ms. Quimby's deposition testimony indicates that the finger markings were first sketched on a baseball's cover and then the cover was removed and traced to produce the drawings she submitted to the sporting goods manufacturers. There is no evidence, however, that an actual prototype Q-ster ball was ever perfected by the Quimbys, and it is clear from her testimony that no "actual baseballs" were ever included as part of the proposal packages sent by Ms. Quimby to the sporting goods companies from which she solicited payment for her idea. Quimby at 38–39.

Furthermore, it is unclear whether John Quimby's use of a baseball on which he had sketched markings on its cover to teach a neighborhood boy how to pitch constitutes "public use" within the meaning of § 102(b). Indeed, Ms. Quimby stated that, at the time she saw her son draw a hand position on a baseball for the neighborhood boy, she had not conceived of the idea of inventing a pitching training device comprising a baseball with finger place-

ment indicia. *Id.* at 37–38. Instead, according to Ms. Quimby's testimony, her conception of the idea for the Q-ster ball did not occur until later when she "sat down with [her] son" to discuss the matter. *Id.* With the exception of the above alleged prior public use of the ball by John to teach another child living nearby how to pitch, no other use, public or otherwise, appears to have occurred once the idea was reduced to drawings. In fact, of the approximately five persons involved in the development of the Q-ster ball idea, Ms. Quimby testified that "they all knew to keep it confidential." *Id.* at 34. Moreover, although Ms. Quimby testified that she sent copies of a proposal of her Q-ster ball idea to several sporting good manufacturers, an act defendant contends establishes that the idea was used publicly, Ms. Quimby testified that her ideas were sent to the companies in confidence, and with the understanding that none of the manufacturers would publicize her idea unless or until she had granted her consent for such use. *Id.* at 33. According to the Federal Circuit, "third party secret commercial activity, more than one year before the patent application of another, is not a § 102(b) bar." *Woodland Trust v. Flowertree Nursery, Inc.,* 148 F.3d 1368, 1371 (Fed.Cir.1998) (citing *W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1550 (Fed.Cir.1983).

■ In any event, the court concludes that a material issue of fact remains for trial with respect to whether the '193 patent is rendered invalid for anticipation by the Quimby ball. In that regard, the court believes that there exist sufficient facts from which a reasonable fact finder could conclude that the Quimby ball is not anticipatory. Indeed, the Quimby ball appears to differ in many respects from the plaintiff's product. First, unlike the plaintiff's instructional pitching device, the Quimby drawings did not indicate the use of color coding to demonstrate finger placement.

Quimby Depo. at 53–54. Instead, Ms. Quimby's illustrations included written descriptions such as "middle," "index," and "ring" to demarcate finger placement. *Id.* at 16. Additionally, unlike plaintiff's ball on which the markings representing four different types of pitches appear, Ms. Quimby testified that she had envisioned her idea as comprising several different balls, each teaching one specific type of pitch, as opposed to placing markings for several different pitches onto one ball. *Id.* at 20. Ms. Quimby stated that she thought her idea would be more profitable if it were manufactured in that manner. *Id.* at 58. Furthermore, it is unclear whether the Quimby ball disclosed a specific means for indicating orientation with respect to the palm of the hand, such as the tapered ends claimed in the '193 patent. Accordingly, because the court cannot conclude, as a matter of law, that the Quimby ball included each of the claims set forth in the '193 patent, defendant's motion for summary judgment of invalidity on the basis of anticipation is denied.

### C. Obviousness

■ A patent is invalid for obviousness if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a). With respect to the obviousness issue, the court notes that "[t]hroughout the obviousness determination, a patent retains its statutory presumption of validity, *see* 35 U.S.C. § 282, and the movant retains the burden to show the invalidity of the claims by clear and convincing evidence as to underlying facts." *Rockwell Intern. Corp. v. United States,* 147 F.3d 1358, 1364 (Fed.Cir.1998).

■ It is well-settled that "the ultimate question of obviousness is a question of law." *Richardson–Vicks Inc. v. Upjohn Co.,* 122 F.3d 1476, 1479 (Fed.Cir.1997). Even so, "it is well understood that there are factual issues underlying the ultimate obviousness decision." *Id.* Specifically, the obviousness analysis is based on four underlying factual inquiries, the so-called *Graham* factors: "(1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of nonobviousness." *Kegel Co., Inc. v. AMF Bowling, Inc.,* 127 F.3d 1420, 1430 (Fed.Cir.1997); *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). In its evaluation of the underlying facts, "obviousness" must not be confused with "obvious to try," as the two are distinct concepts. *See, e.g., In re Deuel,* 51 F.3d 1552, 1559 (Fed.Cir.1995) (" 'Obvious to try' has long been held not to constitute obviousness."); *Gillette Co. v. S.C. Johnson & Son, Inc.,* 919 F.2d 720, 725 (Fed.Cir.1990).

In its summary judgment papers, defendant contends that plaintiff's patent is invalid for obviousness. More specifically, defendant argues that U.S. Patent Nos. 3,110,494 and 2,925,273, the Morgan and Pratt patents, respectively, as well as the Quimby ball render plaintiff's use of finger markings to teach pitching obvious to one of ordinary skill in the art. In response, plaintiff submits that the claims set forth in the '193 patent are nonobvious and valid. Plaintiff argues that significant differences exist between the prior art and the claims set forth in the '193 patent, and that, if plaintiff's product is deemed to constitute a combination of elements lifted from the prior art, defendant has not met its burden to prove, by clear and convincing evidence, that there existed a motivation to combine the prior art elements under the facts and circumstances of this case.

The Pratt patent discloses a baseball with finger placement indicia designed to

teach students how to hold the ball in order to throw certain types of pitches. Pratt Patent at 1:23–27. As the court noted in its previous *Markman* order, during the prosecution of the '193 patent, the Board of Patent Appeals and Interferences of the Patent and Trademark Office concluded that Pratt does not disclose orientation means. *Ex parte McGinley,* No. 94–1121, slip op. at 15 (Bd. Patent App. Feb. 10, 1994) (expressly overruling patent examiner's conclusion that Pratt discloses orientation means). The Pratt patent, therefore, differs in at least this respect from the '193 patent, which specifically claims a "means for indicating the orientation of the baseball relative to the palm of the hand." '193 Patent, Claim 1.

The Morgan patent teaches "two semispherical shells ... rigidly joined to one another at a circumferentially extending junction line ... by means of glue, cement, or other binding agent." Morgan Patent at 2:5–11. In contrast, plaintiff's product "conforms to the official size and weight requirements of a regulation baseball." '193 Patent at 2:63–66. Furthermore, whereas plaintiff's product teaches specific types of pitches, including the two- and four-seam fastball, curveball, and slider, Morgan teaches a product for use in instructing students to throw a baseball "so that it will curve or break." Morgan Patent at 1:15–16. Additionally, rather than mere markings placed directly on the device itself, the first alternative form of the Morgan reference suggests a molding process whereby recessed and contoured finger elongate areas are "formed as part of the [two semi-spherical] shells ... at the time of production thereof." *Id.* at 2:64–67. The elongated, recessed areas on the Morgan product are U-shaped. *Id.* at 2:23. The second alternative form taught in the Morgan patent discloses the placement of the elongated markings on the ball "in a color contrasting to that of the shells to indicate the placement of the fingers" and thumb of the user. *Id.* at 3:12–18.

The Quimby's "Q-ster" ball, as described more fully above in Section III.A, also teaches the use of markings on a baseball cover to demonstrate how to hold a baseball in order to throw a specific type of pitch. The Quimby ball does not disclose color-coded indicia, contemplates only "one pitch per ball," and may not teach a means for orienting the ball relative to the palm of the hand.

The gist of defendant's argument with respect to the obviousness issue is that anything not found in one prior art reference is found in another, and that the idea to combine certain elements from the prior art to produce the product specified in the '193 patent would have been obvious to one skilled in the art at the time of plaintiff's invention. Plaintiff disagrees, arguing that defendant has failed to establish that, as a matter of law, the motivation to combine the elements from different prior art references existed, or more importantly, that the '193 patent is merely a combination of the elements present in the prior art, as opposed to a distinctly different invention.

As recently noted by the Federal Circuit, "[i]n order for a claim to be invalid for obviousness over a combination of references, there must have been a motivation to combine the prior art references to produce the claimed invention." *Chiuminatta,* 145 F.3d at 1312. Indeed, the decision to invalidate a patent for obviousness "must involve more than indiscriminately combining prior art; a motivation or suggestion to combine must exist." *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.,* 103 F.3d 1538, 1546 (Fed.Cir.1997). Accordingly, § 103 requires the court to analyze the claimed invention as a whole; "[f]ocusing on the obviousness of substitutions and differences, instead of on the invention as a whole, is a legally improper way to simplify the often difficult determination of obviousness." *Gillette Co. v. S.C.*

*Johnson & Son, Inc.,* 919 F.2d 720, 724 (Fed.Cir.1990). Describing the need to consider the challenged patented invention as a whole rather than as an amalgam of separate elements, the *Gillette* court explained:

It is true that [a claimed invention may] consist[ ] of a combination of old elements so arranged as to perform certain related functions. It is immaterial to the issue, however, that all of the elements were old in other contexts. What must be found obvious to defeat the patent is the claimed combination.

*Id.* (quoting *Kimberly–Clark Corp. v. Johnson & Johnson,* 745 F.2d 1437, 1448 (Fed.Cir.1984).

■■■ The court concludes that defendant has failed to demonstrate an absence of a material fact issue with respect to the issue of obviousness. On the contrary, it is quite clear from the parties' differing views regarding the scope of the prior art, the ideas disclosed therein, and the differences between the prior art and the '193 patent, that fundamental factual issues remain unresolved at this stage of the litigation. Moreover, the court believes that an issue of material fact remains for trial with respect to whether there truly existed a motivation to combine the elements cited in the Quimby, Morgan, and Pratt references to achieve the baseball disclosed in the '193 patent.

Furthermore, the court notes that, although plaintiff has presented evidence relevant to the court's *Graham* analysis, defendant has wholly failed to address, much less present any evidence relating to, two of the four factors. Specifically, defendant has failed to submit any evidence from which the court could assess, as a matter of law, the relevant level of skill possessed by one skilled in the art, much less evidence sufficient to establish the assertion that, if faced with the relevant prior art, plaintiff's invention would be ob-

vious to one skilled in the art. Additionally, defendant has failed to address the final factor necessary to a complete obviousness analysis, namely, the existence of "secondary considerations," if any are implicated under the facts and circumstances of this case. Without proper consideration of these factors and any evidence related thereto, the court's obviousness analysis would be incomplete. *See Greenwood v. Hattori Seiko Co. Ltd.,* 900 F.2d 238, 241 (Fed.Cir.1990) ("Since the proper *Graham* analysis was not made by the district court, the summary judgment of obviousness under 35 U.S.C. § 103 must be vacated.") Accordingly, defendant's motion for summary judgment of invalidity on the basis of obviousness is denied.

### C. "Best Mode" Requirement

■■■ Additionally, defendant contends that plaintiff's '193 patent is invalid because plaintiff failed to satisfy the "best mode" requirement as set forth in 35 U.S.C. § 112, ¶ 1. 35 U.S.C. § 112, 1. Section 112, ¶ 1 provides, in pertinent part, that "[t]he specification ... shall set forth the best mode contemplated by the inventor of carrying out his invention." *Id.* The underlying purpose of the best mode requirement is to "restrain inventors from applying for a patent while at the same time concealing from the public preferred embodiments which the inventor has, in fact, conceived." *Young Dental Mfg. Co. v. Q3 Special Prods., Inc.,* 112 F.3d 1137, 1144 (Fed.Cir.1997). To establish invalidity for failure to disclose the best mode, "the party seeking to invalidate the patent must present clear and convincing evidence that the inventor both knew of and concealed a better mode of carrying out the claimed invention than was set forth in the specification." *Id.* Satisfaction of the best mode requirement is a question of fact. *Bruning v. Hirose,* 161 F.3d 681, 687 (Fed.Cir.1998).

■■■ Defendant argues that the '193 patent is invalid because McGinley failed

to disclose the best mode known to him at the time the patent application was filed. In this regard, defendant explains that McGinley admits that the shape of the finger marks present on his prototype and on his first commercial product differ from the shape of the finger marks illustrated in the patent specification. Indeed, whereas the patent illustrations depict elliptical, egg-shaped finger markings, the markings on plaintiff's first prototype as well as the actual commercial product exhibit slightly concave indentations at the tapered end of each indicium.[7] Defendant therefore argues that plaintiff failed to disclose the best mode of his invention.

That the difference between the disclosed marks and those found in plaintiff's commercial product is hardly profound may account for a fundamental shortcoming in defendant's best mode argument: in its papers, defendant fails to explain how or why the slightly-indented-at-the-tapered-end markings on the commercial product are superior to the markings illustrated in the patent. Because the purpose of the best mode requirement is to prevent inventors from secretly withholding a preferred embodiment from the public, the allegedly undisclosed preferred embodiment must be, at the very least, better than, and ultimately superior to, the disclosed embodiment. *See Minco, Inc. v. Combustion Engineering, Inc.*, 95 F.3d 1109, 1115–16 (Fed.Cir.1996) ("The record must show that the inventor considered an alternative mode superior to the disclosed mode.")

Relying on *Chemcast Corporation v. Arco Industries Corporation*, 913 F.2d 923 (Fed.Cir.1990), defendant argues that it need not present evidence to establish that the undisclosed element is superior to the disclosed embodiment. The court does not agree because it believes that, on its facts, the *Chemcast* case is distinguishable from the case presently before the court.

In *Chemcast*, the Federal Circuit affirmed a finding of invalidity for failure to satisfy the best mode requirement. *Id.* at 930. There, plaintiff manufacturing company held a patent for a plastic grommet fastening device "designed to seal an opening in, for example, a sheet metal panel." *Id.* at 924. The specification at issue in that case disclosed the following:

> The annular locking portion [ ] of the sealing member [ ] is preferably comprised of a rigid castable material, such as a castable resinous material, either a thermoplastic or thermosetting resin, or any mixtures thereof, *for example, polyurethane or polyvinyl chloride.* The [locking] portion [ ] also should be made of a material *that is sufficiently hard and rigid so that it cannot be radially compressed,* such as when it is inserted in the opening [ ] in the panel [ ]. Materials having a *durometer hardness reading of 70 Shore A or harder are suitable in this regard.*

*Id.* at 929 (emphasis added). Despite the vague and indefinite nature of the above language, the district court concluded that, at the time he filed his patent application, the inventor had only considered and used one type of material, and that he had definitively assessed the precise rigidity factor required to practice his invention. *Id.* In fact, the evidence showed that no other compound had been used by the inventor in the practice of his invention,

---

**7.** The court notes that the subject alteration between the commercial product's markings and those depicted in the patent illustrations is so slight that the court was at first unsure to what difference defendant referred in its motion. Indeed, the deepest part of each indentation found at the tapered end of each finger indicium on plaintiff's commercial ball is less than $\frac{1}{16}$ of an inch. The markings themselves are fingertip-sized; approximately an inch long by one-half inch wide. Nonetheless, the markings on the plaintiff's product and those depicted in the patent drawings do differ to some extent, however slight that difference may be.

and that he had purchased the material from another company "which had spent 750 man-hours developing the compound specifically for [plaintiff]." *Id.* In light of the fact that the inventor had utilized only one specific type of material, one manufactured especially for that purpose, to practice his invention, and because he therefore knew of the exact type of preferred material required to practice his invention when he filed his patent application, the inventor's generic reference to *potentially* suitable materials violated the best mode requirement. *Id.* The court found likewise insufficient the open-ended reference to the optimal level of rigidity of the subject material, when the disclosed suggestion ("70 shore A or harder") exhibited substantially different properties than the material actually practiced ("75 +/− 5 Shore D"). *Id.* In light of the above findings of fact, the court held that "where the inventor has failed to disclose the only mode he ever contemplated of carrying out his invention, the best mode requirement is violated." *Id.* at 930.

In this case, defendant draws the unsubstantiated conclusion that because the markings on plaintiff's prototype exhibited the slight indentations and the patent illustrations did not, the indented marks "were the only mode [McGinley] contemplated." Def.Mem. in Supp. of Invalidity at 3. While it is true that where an inventor fails to disclose the only mode he ever contemplated of carrying out his invention, the best mode requirement is violated, there is no evidence on the summary judgment record currently before the court to support defendant's assertion that the indented markings were the *only* mode contemplated by plaintiff when he filed his patent application. Defendant's argument on this basis is, therefore, rejected.

Furthermore, despite its holding that a failure to disclose the *only* mode ever contemplated violates the best mode requirement, the *Chemcast* court specifically explained that an inquiry as to whether the inventor knew of a better mode at the time of filing is necessary to any best mode determination:

> In short, a proper best mode analysis has two components. *The first is whether, at the time the inventor filed his patent application, he knew of a mode of practicing his claimed invention that he considered to be better than any other.* This part of the inquiry is wholly subjective, and resolves whether the inventor must disclose any facts in addition to those sufficient for enablement. *If the inventor in fact contemplated such a preferred mode, the second part of the analysis compares what he knew with what he disclosed* —is the disclosure adequate to enable one skilled in the art to practice the best mode or, in other words, has the inventor "concealed" his preferred mode from the "public"?

*Id.* at 927–28 (emphasis added). Thus, contrary to defendant's assertion that the court need not consider whether the plaintiff knew of and concealed a better mode at the time of filing his patent application, the court's best mode analysis necessarily includes such a determination. The record before the court is wholly devoid of any evidence to suggest that McGinley was subjectively aware of a better mode for carrying out his invention than the mode disclosed in the specification. Nor are there any facts to indicate that McGinley intentionally acted to conceal the purported best mode of his invention from the public. On the contrary, the only evidence regarding McGinley's state of mind found in the record negates any such contention.[8] As set forth above, in the absence of clear and convincing evidence to establish the knowledge of a better mode and the active

---

8. In his third sworn declaration, plaintiff states:

I did not conceal a better mode for practicing my invention. At the time I filed my patent application I believed that I had disclosed the best mode for practicing my invention. I still believe that today.

concealment thereof, a finding of invalidity for failure to satisfy the best mode requirement cannot lie. Accordingly, defendant's motion for summary judgment of invalidity for failure to disclose the best mode is denied.

### D. Omitted Element

Lastly, defendant claims that plaintiff's patent fails to satisfy 35 U.S.C. § 112, ¶ 1's "written description" requirement for failure to disclose an element essential to the invention.[9] Specifically, defendant argues that plaintiff's specification fails the so-called "omitted element" test because it fails to disclose that the pitching instructional device described therein includes both left- and right-handed markings.

 Under the "omitted element" doctrine, and as a facet of § 112, ¶ 1's written description requirement, "the patent specification 'must clearly allow persons of ordinary skill in the art to recognize that [the inventor] invented what is claimed.'" *Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1479 (Fed.Cir.1998) (quoting *In re Gosteli*, 872 F.2d 1008, 1012 (Fed.Cir. 1989)). Thus, where a patent specification fails to disclose an element of the invention that would be considered essential to one of ordinary skill in the art, the "omitted element" test is violated. *See id.* A patent owner is not necessarily limited to the claims set forth in the preferred embodiment section of the specification. *See id.* ("It is a truism that a claim need not be limited to a preferred embodiment"); *see also Ethicon Endo–Surgery, Inc. v. United States Surgical Corp.*, 93 F.3d 1572, 1582 n. 7 ("an applicant . . . is generally allowed claims, when the art permits, which cover more than the specific embodiment shown") (citation omitted).

McGinley Third Decl. at ¶ 8.

9. Section 112, ¶ 1 provides, in pertinent part: The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms

In its February 19, 1999 *Markman* order, the court construed "the finger placement indicia limitation of claim 1[as] not requir[ing] both-left-and-right-handed markings," thereby specifically rejecting this argument the first time around. *McGinley v. Franklin Sports, Inc.*, 45 F.Supp.2d 1141, 1145 (D.Kan.1999). At that time, however, the court noted that the issue of compliance with the written description requirement under § 112, ¶ 1 is an issue of fact unsuitable for determination in a *Markman* proceeding. *Id.* at 1144–45.

The court notes that defendant did not raise the "omitted element" issue in either of its motions for summary judgment on the issue of patent validity or infringement, or in any of its other summary judgment papers. Instead, the issue appears to have been raised as part of the Expert Witness Report of Bernarr Roe Pravel. *See* Pravel Report at ¶ 14. As noted above, this report does not qualify as competent evidence under Fed.R.Civ.P. 56(e), and it certainly is not the proper setting in which to raise a legal argument. As such, the court declines to address the matter at this stage of the litigation. Because the determination of compliance with § 112, ¶ 1 is a question of fact, *see Tronzo v. Biomet*, 156 F.3d 1154, 1158 (Fed.Cir. 1998), to the extent that an issue of material fact remains with respect to this issue, defendant may, of course, litigate the issue at trial.

### E. Recovery of Lost Profits

Additionally, defendant moves for partial summary judgment with respect to whether plaintiff is entitled to recover lost profits from the sale of the Roger Clemens

as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same. . . .

35 U.S.C. § 112, 1.

Instructional Baseball (RCIB) between the dates of April 18, 1995 and April 30, 1998. More specifically, defendant claims that neither plaintiff, nor USA Products, Inc. (USA), the company licensed to market and distribute the RCIB during that time period, has standing to sue for the recovery of lost profits incurred as a result of defendant's allegedly infringing sale of the 2705 ball.

The facts relevant to this issue are uncontroverted. Between February, 1991 and April, 1994, USA marketed and distributed plaintiff's RCIB product pursuant to a verbal exclusive licensing agreement between plaintiff and USA. In January of 1994, the parties reduced their exclusive licensing agreement to writing. The commercial relationship between USA and Mr. McGinley was terminated at some point later that year. Shortly thereafter, litigation arose between USA and McGinley, which was ultimately resolved when the parties agreed to settle the dispute in April of 1998. At that time, the parties entered into a settlement agreement which purported to void *ab initio* the parties' previously-executed licensing agreement.

During the course of the USA–McGinley litigation, USA continued to lawfully sell the RCIB product pursuant to the parties' then-existing exclusive licensing agreement. Between April 18, 1995 and April 30, 1998, plaintiff did not license his invention to any person or business other than USA, and plaintiff was himself prohibited from manufacturing, marketing, or selling his pitching device during that time by an injunction entered against him by the District Court of Johnson County, Kansas.

In an action for patent infringement, 35 U.S.C. § 284 authorizes the court to award compensatory damages upon a finding of infringement. *See* 35 U.S.C. § 284. Although it is generally recognized that "[t]he right to sue for infringement is ordinarily an incident of legal title to the pat-

ent," an exclusive licensee may nonetheless "obtain sufficient rights in the patent to be entitled to seek relief from infringement." *Abbott Laboratories v. Diamedix Corp.*, 47 F.3d 1128, 1131 (Fed.Cir.1995). Thus, plaintiff argues, because USA was granted an exclusive license to sell the RCIB product during the time in which defendant sold its pitching device, USA is legally entitled to recover profits lost as a result of defendant's infringing activities. That USA and McGinley subsequently declared the exclusive licensing agreement void *ab initio* during the course of litigation wholly unrelated to the case currently before the court, plaintiff maintains, should not preclude his recovery of damages incurred by USA as a result of defendant's infringing sales. Instead, plaintiff claims, the USA–McGinley settlement agreement clearly establishes that the parties thereto intended an assignment to plaintiff of USA's right to recover damages for patent infringement accruing during the time that the USA–McGinley licensing agreement was in effect.

Defendant does not quibble with the legal assertion that an exclusive licensee is, as a general rule, afforded the right to sue and collect monetary damages against an alleged infringer in conjunction with the patent owner/licensor. Rather, defendant argues that because the exclusive licensing agreement previously executed between plaintiff McGinley and USA was later declared void *ab initio* by the parties thereto, USA never acquired status as an exclusive licensee. Thus, defendant claims, as a consequence of the parties' settlement agreement, no exclusive licensing rights devolved upon USA at any time, and USA has no right to claim lost profits allegedly accruing during the period of its later-voided licensing agreement. In other words, defendant argues, because the parties' exclusive licensing agreement was later stipulated by the parties as void from its inception, USA has no standing to claim

profits allegedly lost to defendant by virtue of Franklin's infringing sale of the 2705 ball, and plaintiff McGinley is, therefore, barred from recovering any damages on USA's behalf.

In this regard, defendant refers the court to paragraph 1.2 of the USA–McGinley settlement agreement, which provides, in pertinent part:

> License Agreement Void. CLAIMANTS [10] acknowledge and agree that the LICENSE AGREEMENT shall be deemed void ab initio and of no effect. CLAIMANTS further acknowledge and agree that they are hereby relinquishing whatever rights or entitlements any or all of them may have had in or to the PITCHING DEVICE, by virtue of the LICENSE AGREEMENT or otherwise, and CLAIMANTS do hereby assign, transfer and convey the same to MCGINLEY, including the right to sue and collect damages for any past, current or future infringement of U.S. Patent No. 5,407,193 . . . .

USA–McGinley Settlement Agreement, ¶ 1.2.

■■■■■ Under Kansas law,[11] the construction of a written contract is a matter of law for the court. *Wagnon v. Slawson Exploration Co.*, 255 Kan. 500, 511, 874 P.2d 659 (1994). "The cardinal rule of contract interpretation is that the court must ascertain the parties' intention and give effect to that intention when legal principles so allow." *Ryco Packaging Corp. v. Chapelle Int'l, Ltd.*, 23 Kan. App.2d 30, 926 P.2d 669, 674 (1996) (citing *Hollenbeck v. Household Bank*, 250 Kan. 747, 751, 829 P.2d 903, 906 (1992)). Where

a contract is complete and unambiguous on its face, the court must determine the parties' intent from the four corners of the document, without regard to extrinsic or parol evidence. *Simon v. National Farmers Org., Inc.*, 250 Kan. 676, 679–80, 829 P.2d 884 (1992).

As an element of contractual construction, whether an instrument is ambiguous is a question of law for the court. *Id.* A contract is ambiguous if it contains "provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language." *Id.* Contractual ambiguity appears only when "the application of pertinent rules of interpretation to the face of the instrument leaves it generally uncertain which one of two or more possible meanings is the proper meaning." *Marquis v. State Farm Fire and Cas. Co.*, 265 Kan. 317, 324, 961 P.2d 1213, 1219 (1998). The court must not consider the disputed provision in isolation, but must instead construe the term in light of the contract as a whole, such that if construction of the contract in its entirety removes any perceived ambiguity, no ambiguity exists. *Arnold v. S.J.L. of Kansas Corp.*, 249 Kan. 746, 749, 822 P.2d 64 (1991).

■■■■ Although plaintiff does not specifically raise the issue, implicit in its papers is the assertion that the contract is legally ambiguous. Indeed, paragraph 1.2 of the settlement agreement is wholly inconsistent: while the first sentence of paragraph 1.2 purports to void any previously-executed licensing agreement, the following sentence purports to assign rights that could only have accrued during the term of the

---

**10.** The settlement agreement was entered into by USA Products, and its owners, Howard and Keith Illig. For the sake of simplicity, the court has referred to these parties collectively as "USA."

**11.** Paragraph 3.14 of the settlement agreement between McGinley and USA Products provides that the contract "shall in all respects be governed by the laws of the state of Kansas." Accordingly, the court construes the terms of the contract in accordance with Kansas law.

licensing agreement.[12] Thus, despite the parties' use of the term void *ab initio*, it is entirely unclear from the contractual language whether the parties intended to use that term in a literal sense, such that the contract was truly declared void from its inception, an interpretation that simply cannot be reconciled with the remainder of the contract, or whether they were instead using the term in an attempt to express that the licensing agreement was, as of the date of the settlement, legally void. Consequently, the court is not prepared to rule, as a matter of law, that the USA–McGinley settlement agreement operated to wholly invalidate from its inception the parties' licensing agreement. Summary judgment is, therefore, inappropriate with respect to this issue.

**IT IS THEREFORE BY THE COURT ORDERED THAT** plaintiff's cross-motion for summary judgment on the issue of infringement (doc. 114) is GRANTED.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant's cross-motion for summary judgment on the issue of infringement (doc. 61) is DENIED.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant's motion for summary judgment of invalidity (doc. 117) is DENIED.

**IT IS FURTHER ORDERED BY THE COURT THAT** defendant's motion for partial summary judgment on the issue of damages (doc. 115) is DENIED.

---

12. The above-noted ambiguity is compounded when read in conjunction with paragraph 1.7 of the parties' contract. Paragraph 1.7 of the settlement agreement, entitled "Suit for Infringement," provides in pertinent part:

> In the event MCGINLEY elects to sue and collect damages for the infringement of his patent of the PITCHING DEVICE, the parties agree that CLAIMANTS shall have no obligation, whatsoever, to fund or otherwise pay for any lawsuit that MCGINLEY files.

In a similar vein, CLAIMANTS also acknowledge and agree that none of them shall have any interest in such a lawsuit or in any recovery that may be had, by judgment, settlement, or otherwise. USA–McGinley Settlement Agreement, ¶ 1.7. The inclusion of this paragraph reinforces the court's misgivings as to whether the parties truly intended void *ab initio* in the literal sense.